# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | | |
|---|---|---|
| **RUTHERFORD COUNTY SCHOOLS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No. 3:26-cv-_____ |
| | ) | |
| | ) | |
| **H.B., A MINOR STUDENT, THROUGH** | ) | |
| **THE PARENTS, D.B. AND S.B.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

COMES NOW Plaintiff Rutherford County Schools ("Plaintiff" or "RCS"), by and through counsel, and hereby submits this Complaint against Defendants H.B., a minor student, through the parents, D.B. and S.B. In support thereof, Plaintiff alleges the following:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Rutherford County Schools is the local education agency ("LEA") for Rutherford County, Tennessee

2.      Defendant H.B. is a minor student who resides with her father, Defendant D.B., and her mother, Defendant S.B., in Murfreesboro (Rutherford County), Tennessee.

3.      This action arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* Jurisdiction is conferred upon this Court by the IDEA, 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provide district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy.

Case 3:26-cv-00071    Document 1    Filed 01/20/26    Page 1 of 45 PageID #: 1

4.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiff is a local education agency within the boundaries of the Middle District of Tennessee and all events giving rise to this Complaint occurred in Rutherford County, Tennessee, within this judicial district.

5.      Administrative exhaustion occurred through a state due process hearing with an Amended Final Order by Richard M. Murrell, Administrative Law Judge, on November 20, 2025 ("Final Order"). This appeal is therefore timely, brought within sixty (60) days thereafter.

6.      Plaintiff is aggrieved by portions of the Final Order as well as a subsequent Order entered on January 20, 2026 and seeks judicial review of those determinations only.

## FACTS[1]

### October 3, 2024 Email and Observations by Teachers

7.      At the time of the incidents alleged in the Due Process Complaint, H.B. was an 8th grade student at Whiteworth-Buchanan Middle School ("WBMS").  (*See generally* Due Process Complaint; Trial Tr. Vol. 1, Ex.12).  During H.B.'s 8th grade year, H.B. had an IEP for "intellectual giftedness".  (Trial Tr. Vol. 1, Ex.12).

8.      S.B. is H.B.'s mother.   D.B. is H.B.'s father.   (*See generally* Due Process Complaint).

9.      Centerstone is a community organization that is generally outside of school; however, they will sometimes come into schools and provide certain types of mental health therapy to students.   (Trial Tr. Vol. 1, 69:13-24).  RCS provides an office to Centerstone at WBMS and

---

[1] The facts recited herein are based upon the trial transcript of the administrative due process hearing filed herewith as Exhibits "1" (Volume I) and "2" (Volume II) and the Due Process Complaint filed herewith as Exhibit "3".

certain students see a Centerstone therapist at WBMS. Centerstone is a separate entity from RCS or WBMS. (Trial Tr. Vol. 1, Ex. 8).

10.      Centerstone therapy is available to any and all students within the school regardless of disability. Sometimes there is a referral made by a school counselor and sometimes it could be a parent requesting it; the school provides the information and the parents and Centerstone get everything set up. The only thing the school does is provide the Centerstone therapist a location to work. Appointments are arranged by the student's parents. (Trial Tr. Vol. 1, 201:5-20).

11.      H.B. first started receiving therapy services from Centerstone towards the end of her 6th grade year. (Trial Tr. Vol. 1, 244:1-4).

12.      H.B. maintained mostly A's and a couple B's in 7th grade. (Trial Tr. Vol. 1, Ex. 11).

13.      During her 8th grade year, and up until March 15, 2025, H.B. would occasionally be pulled out of class for her Centerstone therapy sessions approximately 2-3 times a month, until H.B. attempted suicide on March 15, 2025. Thereafter, the visits switched back to once a week. (Trial Tr. Vol. 1, Ex. 25 (Centerstone attendance record); Trial Tr. Vol. 1, 246:7-11).

14.      S.B. first noticed self-harm on H.B. in May or June of 2024, which would have been at the end of H.B.'s 7th grade year, when S.B. noticed some healed scars on H.B.'s arm when they were at a waterpark. (Trial Tr. Vol. 1, 242:20 – 243:9).

15.      Michell Willatt ("Ms. Willatt") was H.B.'s honors algebra teacher during H.B.'s 8th grade year at WBMS and also saw H.B. on the soccer field as a referee. (Trial Tr. Vol. 1, 23:13-21).

16.      Ms. Willatt's honors algebra class met five (5) days a week, (Trial Tr. Vol. 1, 24:4-16), and H.B. would occasionally be pulled out of her class by a therapist from Centerstone named Jessica Micthell ("Ms. Mitchell"). (Trial Tr. Vol. 1, 28:18-21).

17.    D.B. told Ms. Willatt that he recommended that H.B. be allowed to miss these honors algebra classes for H.B.'s therapy sessions with Centerstone and that he had no problem with it.  (Trial Tr. Vol. 1, 35:11-13).

18.    Ms. Mitchell is the therapist that works for Centerstone that comes into the WBMS building to conduct therapy sessions.   (Trial Tr. Vol. 1, 122:14-18).   Ms. Mitchell had an employment contract with Centerstone and was paid by Centerstone.  Ms. Mitchell was not an employee of RCS.  (Trial Tr. Vol. 1, 322:10-18).

19.    In addition to seeing H.B., Ms. Mitchell conducted family therapy sessions with H.B., D.B. and S.B. on at least 2-3 occasions via zoom and possibly one other time in-person at their house.  (Trial Tr. Vol. 1, 277:2-15).

20.    On October 3, 2024, D.B. sent Ms. Willatt an e-mail that H.B. had harmed herself in Ms. Willatt's class with a pencil and mentioned that H.B. was communicating better than in year's past but that H.B. still tended to sit silently with struggles that turned into stress, and that turned into anxiety, and that fed into all the other teenage girl anxiety and slips into depression. (Trial Tr. Vol. 1, Ex. 1).

21.    D.B. asked Ms. Willatt to keep all of the information in his October 3, 2024 private between her, D.B., and S.B. because they didn't want H.B.'s teachers or friends to know about it. (Trial Tr. Vol. 1, 28:22-24; Ex. 1).

22.    Ms. Willatt told D.B. that she had no idea that H.B. was harming or had harmed herself and that H.B. was volunteering frequently during the bellwork and seemed confident in her understanding in class.  (Trial Tr. Vol. 1, Ex. 1).

23.     Per H.B., the only time that she engaged in self-harm in school during 8th grade was on this occasion.  And besides Ms. Willatt, H.B. never told anybody else at WBMS that she was self-harming herself.  (Trial Tr. Vol. 1, 222:18 – 223:8).

24.     After this e-mail exchange, Ms. Willatt went and informed the guidance counselors at WBMS about the content of the e-mail from D.B., and the guidance counselor, Marcus Lyons ("Mr. Lyons"), asked her for the name of the student because he needed to advise the administration.  Mr. Lyons also told Ms. Willatt she needed to send D.B. some mental health resource information.  (Trial Tr. Vol. 1, 29:25 – 30:14).

25.     Mr. Lyons has been a school counselor for thirteen (13) years.  He does not provide therapy; instead, his counseling would be connected to academic concerns, college and career advice, and maybe some social and emotional aspects such as relationship issues between students or if a student is not feeling their best then they will talk through it.  (Trial Tr. Vol. 1, 68:10-24).  Mr. Lyons was not the 504 Coordinator at WBMS during H.B.'s 8th grade year.  (Trial Tr. Vol. 1, 71:16-18).  Mr. Lyons has a Master's Degree in human development counseling and licensure in school counseling.  (Trial Tr. Vol. 1, 84:23 – 85:1).

26.     Mr. Lyon's thereafter e-mailed Ms. Willatt asking that Ms. Willatt advise the parents to keep H.B. away from "sharps"[2] and to keep and eye on them and not leave them alone.  (Trial Tr. Vol. 1, Ex. 2).  In addition, Mr. Lyon's e-mailed certain individuals, which included WBMS Administrative personnel Principal April Sneed ("Ms. Sneed") and Assistant Principal Rebecca Cousin ("Ms. Cousin"), informing them of what H.B.'s parents told Ms. Willatt, (Trial Tr. Vol. 1, Ex. 2 & Ex. 9), and that they [H.B.'s parents] were aware of a self-harm issue with H.B. and that

---

[2] "Sharps" is a medical term for devices with sharp points or edges that can puncture or cut skin. https://www.fda.gov/medical-devices/consumer-products/safely-using-sharps-needles-and-syringes-home-work-and-travel

they [H.B.'s parents] were getting help for H.B. and that they [H.B.'s parents] did not want Ms. Willatt to tell anyone about it. (Trial Tr. Vol. 1, Ex. 2 & Ex. 9).

27. Prior to this time, Mr. Lyon's had maybe met with H.B. for school counseling sessions on one (1) or two (2) occasions, and at no point did H.B. describe anything to Mr. Lyons regard self-harm, suicidal ideations, or being depressed. (Trial Tr. Vol. 1, 79:19 – 80:9; 84:14-17). Mr. Lyon's remembers that the discussion involved something about academic performance on a particular assignment and how H.B.'s parents would react, but that was the extent of it; however, H.B. appeared to be okay when she left. (Trial Tr. Vol. 1, 80:12-16; 81:1-5). Also, prior to this time, Mr. Lyons had never heard of "cutting" related to H.B., (Trial Tr. Vol. 1, 76:20-22), and Mr. Lyons never observed any indications of self-harm on H.B. when she visited with Mr. Lyons, (Trial Tr. Vol. 1, 82:1-3). Further, H.B. never discussed with Mr. Lyons anything regarding any bullying that H.B. was apparently experiencing. (Trial Tr. Vol. 1, 81:6-8).

28. During H.B.'s 8th grade year, no teacher approached Mr. Lyons to say that H.B. was having behavioral issues, academic performance issues, or attendance issues. (Trial Tr. Vol. 1, 82:4-14). Further, nobody ever asked Mr. Lyons to look into whether H.B. needed any sort of testing modifications or reduced workload or other accommodations. (Trial Tr. Vol. 1, 82:15-18).

29. At the time of the October 3, 2025 e-mail from D.B., Mr. Lyons did not have any school-base indicators that H.B. needed additional support services or special education services. (Trial Tr. Vol. 1, 83:7-11).

30. Other than relaying the information conveyed in D.B.'s October 3, 2025 e-mail to WBMS Administration and asking Ms. Willatt to provide H.B.'s parents with mental health resources, Mr. Lyons felt he did not need to do anything further because he believed that the bases at that time were covered just in terms of what could be done at school, especially given the request

from the parents to maintain privacy.  (Trial Tr. Vol. 1, 83:22 – 84:13).  In his view, this instance simply consisted of a secondhand report of self-harm and a parent requesting confidentiality, and with no other indicia that there was a problem.  As such, Mr. Lyons did not believe he needed to do anything further.  (Trial Tr. Vol. 1, 87:17- 88:6).

31.     Ms. Willatt then sent an e-mail to D.B. attaching a mental health resource sheet. (Trial Tr. Vol. 1, 33:19-21).

32.     Thereafter, Ms. Willatt continued to allow H.B. to use and pen and pencil in her class but just tried to keep an eye on her.  (Trial Tr. Vol. 1, 33:14-18).

33.     Prior to the e-mail exchange between D.B. and Ms. Willatt on October 3, 2024, H.B.'s parents had never confided in Ms. Willatt about any stress or anxiety that H.B. was experiencing or anything regarding suicide.  (Trial Tr. Vol. 1, 39:15-25).

34.     After the October 3, 2025 e-mail, H.B.'s parents never provided Ms. Willatt any other information about H.B.'s medication, and there was no other information that Ms. Willatt received or observed that would cause Ms. Willatt to report anything of concern regarding H.B. (Trial Tr. Vol. 1, 43:13-19).

35.     Ms. Willatt never once witnessed H.B. self-harming herself.  (Trial Tr. Vol. 1, 40:14-16).

36.     Ms. Willatt never felt threatened by H.B.  (Trial Tr. Vol. 1, 41:23-25).

37.     Ms. Willatt never saw H.B. in her class with any sort of knife.  (Trial Tr. Vol. 1, 42:18-22).

38.     Ms. Willatt never experienced any attendance issued related to H.B.  (Trial Tr. Vol. 1, 44:15-18).

39.     Following Mr. Lyon's involvement regarding D.B.'s October 3, 2025 e-mail, H.B. never came to see Mr. Lyons at any point during the remainder of H.B.'s 8th grade year. (Trial Tr. Vol. 1, 81:9-12). Further, H.B.'s parents never communicated any concerns to Mr. Lyons and never asked Mr. Lyons for any sort of additional counseling services or any sort of referral for a 504 accommodation plan. (Trial Tr. Vol. 1, 81:17-25).

40.     H.B.'s mother, S.B., did not contact anybody within the WBMS Administration about any self-harm issues mentioned in D.B.'s October 3, 2025 e-mail. Nor did S.B. make any written request for any sort of IEP or IDEA evaluation or 504 accommodations. (Trial Tr. Vol. 1, 246:16-247:4).

41.     WBMS is on a quarterly grading system, (Trial Tr. Vol. 1, 34:8-10), and H.B. was very bright and was having no issues keeping good grades in Ms. Willatt's class despite missing some on occasion for her therapy sessions. (Trial Tr. Vol. 1, 34:14 – 35:25).

42.     In fact, H.B. did not have any problem catching up and still performed well in Ms. Willatt's class, and while sometimes H.B. did not turn in her homework, Ms. Willatt did not believe that this was related to being pulled out of the class for therapy sessions with Centerstone. (Trial Tr. Vol. 1, 38:16-21).

43.     Overall, H.B.'s homework to Ms. Willatt reflected that H.B. did well. (Trial Tr. Vol. 1, 38:24 – 39:1). Further, Ms. Willatt did not associate any issues with turning in homework with any of her other observations of H.B., including any sadness or self-harm; Ms. Willatt just thought that H.B. was being lazy, like some teens do when they just don't want to turn in things. (Trial Tr. Vol. 1, 64:9-16).

44.     While at times H.B. got off-task to draw, it is not uncommon for middle school students to get off task and distract themselves with various things, such as drawing or tapping. (Trial Tr. Vol. 1, 41:11-22).

45.     While H.B. wasn't at the top of her class, H.B. still maintained a "low A" grade, which is great for an honors student.  (Trial Tr. Vol. 1, 39:4-10).

46.     Throughout H.B.'s 8th grade year, H.B. maintained high marks in all of her classes, which consisted of high B's and low-high A's.  (Trial Tr. Vol. 1, Ex. 3).

47.     Per the Assistant Principal, Ms. Cousin, H.B. has very good grades as compared to other students—H.B. was on the honor roll and principal's list just about every grading quarter. (Trial Tr. Vol. 1, 170:15-23).

48.     While Ms. Willatt became aware at some point that H.B. was involved in some incident in drama club (the March 2025 drama club incident described below) because H.B. told Ms. Willatt about it one day when they were walking to lunch, (Trial Tr. Vol. 1, 48:2-7), Ms. Willatt never witnessed H.B. getting bullied. (Trial Tr. Vol. 1, 40:1:8).

49.     In one e-mail from D.B. to Ms. Willatt, D.B. mentioned something about bullying, but D.B. did not mention a specific student or specific place, but said they were dealing with it, and this was the only time that H.B.'s parents mentioned anything about bullying to Ms. Willatt. (Trial Tr. Vol. 1, 47:15 – 48:1).

50.     Stephanie Dye ("Ms. Dye") was H.B.'s 7th grade science teacher at WBMS and was also the drama club sponsor during H.B.'s 8th grade year, which is an elective club that meets after school hours.  (Trial Tr. Vol. 1, 90:21 – 91:15).  Ms. Dye has been a middle-school teacher for ten (10) years and has participated in manifestation determinations before, which is a meeting

to determine whether a specific behavior is a manifestation of a student's disability. (Trial Tr. Vol. 1, 101:2-18).

51.     H.B. participated in Ms. Dye's drama club during H.B.'s 7th and 8th grade years, and H.B. was very involved in drama club, having primary, speaking roles and even lead roles that took a substantial amount of involvement and work. (Trial Tr. Vol. 1, 99:13 – 100:1).

52.     Per Ms. Dye, H.B. socially interacted with people and did not have any sort of disciplinary problems up until the incident that occurred with H.B. in drama club in late February 2025 – early March 2025. (Trial Tr. Vol. 1, 100:2-15).

53.     On October 23, 2024, Ms. Dye sent S.B. a text message asking her if the two (2) could briefly talk privately when S.B. came to pick up H.B. from drama club that day. (Trial Tr. Vol. 1, Ex. 11).

54.     The reason Ms. Dye made contact with S.B. was because Ms. Dye had noticed some evidence of self-harm on H.B.'s arm during drama club, and Ms. Dye knew that H.B. was receiving therapy from Centerstone—sometimes during 7th grade H.B. would get pulled from Ms. Dye's class for her therapy with Centerstone, (Trial Tr. Vol. 1, 94:19-21), which occurred maybe once a month, (Trial Tr. Vol. 1, 102:22-24), but otherwise did not cause H.B. to get behind in her work and she was always able to catch up. (Trial Tr. Vol. 1, 102:25 – 103:3). As such, Ms. Dye had a brief conversation with S.B. in order to make S.B. aware of what she saw. The marks on H.B. looked like shallow, uniform scratches. Up until this time, Ms. Dye had never seen scratches before on H.B. (Trial Tr. Vol. 1, 93:1 – 94:1).

55.     During the interaction, S.B. told Ms. Dye that they (H.B.'s parents) were aware of the cuts and that they knew the specific incident that had caused those cuts and that they were seeking help for H.B. (Trial Tr. Vol. 1, 94:22 – 95:2). S.B. did not mention anything about H.B.

and suicide attempts or any other information concerning H.B.'s mental health. (Trial Tr. Vol. 1, 103:18-23). Further, S.B. did not ask for any additional accommodation or ask Ms. Dye to talk with anybody at the school to provide additional supports for H.B. (Trial Tr. Vol. 1, 103:24 – 104:3; 252:16 – 253:2).

56.     Ms. Dye did not report this interaction or the information to anyone at the school, (Trial Tr. Vol. 1, 95:3-10), because S.B. stated that they were getting H.B. help and that seemed to be as far as S.B. wanted the school to go. (Trial Tr. Vol. 1, 104:17-24). If parents are handling things privately with regard to a student, that's not always a situation that the school would be aware of unless it is happening at the school. (Trial Tr. Vol. 1, 110:23 – 111:7).

57.     During H.B.'s 7th grade year, Ms. Dye did not observe any indication that H.B. was not academically performing well, as H.B. has always been a great student. (Trial Tr. Vol. 1, 98:16-19). In fact, H.B. received a 94 in Ms. Dye's 7th grade science class. (Trial Tr. Vol. 1, Ex. 11).

58.     Ms. Dye never observed H.B. getting bullied. (Trial Tr. Vol. 1, 103:7-8).

59.     Per Ms. Dye, H.B.'s demeanor was that she was generally on task and paying attention. While H.B.'s mind would wander a little bit, she would quickly get back on task and was very easily redirectable. (103:9-14).

60.     Ms. Dye never observed H.B. with the fettling knife. (Trial Tr. Vol. 1, 104:25 – 105:3).

61.     Susan Townsend ("Ms. Townsend") is the gifted facilitator at WBMS. In Tennessee, "intellectually gifted" is a special education designation for students. As the facilitator of the gifted program, Ms. Townsend helps to enrich the curriculum and content in the classroom— sometimes she gets pushed-in to classrooms to help and sometimes pulls students out for enrichment. Ms. Townsend is also an English teacher. H.B. was on Ms. Townsend's course load

during H.B.'s 8th grade year, and she saw H.B. almost every day. (Trial Tr. Vol. 2, 377:1-21). Ms. Townsend has been a teacher for 26 years. (Trial Tr. Vol. 2, 383:24).

62.     Ms. Townsend described H.B. as an excellent student. H.B. is quite bright and typically motivated. H.B. was a middle schooler, and so sometimes motivation is a struggle at times, but H.B. was pretty well easily redirected to getting her stuff done. H.B. is very creative, very kind, and very empathetic. (Trial Tr. Vol. 2, 377:22 – 378:4).

63.     H.B. drew pictures with a lot of pencil shading, often in the genre of "anime", which tends to lend towards "dark" simply because that is the style and genre, but she never observed H.B. drawing pictures that involved violence or harm to people or weapons. (Trial Tr. Vol. 2, 378:9-21).

64.     During H.B.'s 8th grade year, Ms. Townsend did not notice any sort of decline in her performance under her tutelage as the gifted facilitator as it pertains to H.B's English curriculum. (Trial Tr. Vol. 2, 379:4-13).

65.     During H.B.'s 8th grade year, Ms. Townsend never witnessed H.B. getting bullied in school. In fact, H.B. had friends and engaged in conversation and group work in a compatible way; H.B. shared information beyond academics in a chatty way and sat near and talked with kids at school during lunch. (Trial Tr. Vol. 2, 381:2-17).

66.     There was nothing out of the ordinary that Ms. Townsend observed that caused Ms. Townsend concern to suggest that maybe H.B. was struggling with anything mentally. (Trial Tr. Vol. 2, 381:18-21).

67.     H.B.'s parents never reached out to Ms. Townsend, either verbally or in writing, asking for any sort of evaluation for any disabilities or 504 accommodations. During her time as the gifted facilitator for H.B., Ms. Townsend never felt the need to implement any accommodations

for H.B. because H.B. did not need any augmentation and access to her learning. (Trial Tr. Vol. 2, 382:6-16).

68.  There was nothing that stood out to Ms. Townsend during H.B.'s 8th grade year that showed any pattern of behavior that caused Ms. Townsend concern as H.B.'s educator. (Trial Tr. Vol. 2, 382:17-22).

**<u>November 12, 2024 IEP Meeting</u>**

69.  An IEP meeting was held for H.B. on November 12, 2025. (Trial Tr. Vol. 1, Ex. 12).

70.  Ms. Cousin attended H.B.'s IEP Meeting on November 12, 2024 as the LEA representative and took notes. (Trial Tr. Vol. 1, 112:22 – 133:7; Ex. 12).

71.  In addition, both S.B. and H.B. were present at the meeting. H.B. sat mostly silent the whole time and did not relay any concerns to the IEP team. (Trial Tr. Vol. 1, 277:16-24).

72.  An IEP meeting is a cooperative process between parents and schools, and it is important that information that is necessary for the student, whether it be concerns regarding mental health or otherwise, that it would be helpful for the parents to provide all helpful information to the IEP team in order to determine what sort of supports are necessary for the student. Ms. Cousin does not believe that S.B. conveyed the requisite information to the IEP team for them to have the best picture of H.B.'s mental health status. (Trial Tr. Vol. 1, 181:9 – 182:4).

73.  On H.B.'s IEP for her 8th grade year (that spanned November 12, 2024 through November 11, 2025), it notes in the "Medical Information Summary" portion that "H.B. has also started taking anti-depressants. Again, this is informational and just for teachers to be aware of." (Trial Tr. Vol. 1, Ex. 12).

74. At the IEP meeting, which occurred over a month after D.B. sent Ms. Willatt the October 3, 2025 e-mail about self-harm, S.B. did not mention anything about regarding H.B. self-harming herself, H.B. having suicidal ideations, or anything else about H.B.'s mental health, anxiety, or depression apart from the information contained in the medical information summary in the IEP. (Trial Tr. Vol. 1, 180:5-25; 247:25 – 248:7). Further, S.B. did not request any additional supports in a school setting to assist H.B. in her academic or emotional / social ventures. (Trial Tr. Vol. 1, 180:5-25).

75. Importantly, S.B. believed that it was not important to share with the IEP Team at this IEP meeting information related to H.B. engaging in self-harm because there is a very big mental health stigma that can be used against a child frequently. S.B. was nervous to have detailed mental health information in H.B.'s IEP, and S.B. did not think that such information was necessarily related to H.B.'s educational needs. (Trial Tr. Vol. 1, 248:8 – 251:2).

76. In fact, at no point during H.B.'s 8th grade year did S.B. request, either in writing or verbally, an evaluation or 504 accommodations for any mental health disabilities. (Trial Tr. Vol. 1, 181:1-8).

77. As the gifted facilitator, Ms. Townsend was also present at and led this IEP meeting. Ms. Townsend confirmed that, apart from S.B. informing the IEP team that H.B. began taking antidepressants, S.B. did not share anything else with the IEP team regarding H.B.'s mental health, anything about self-harm, or anything about bullying. (Trial Tr. Vol. 2, 380:10 – 381:1).

78. Before every IEP meeting, there is a prevocational checklist done by teachers, and on each checklist are traits of giftedness, which includes socialization, motivation, ability to work with others, and social/emotional learning skills. All of H.B.'s marks were above average or average. The prevocational checklist has a column of "needs improvement, average, or as

expected at that age and grade level, and above average". All of G.B.'s marks always scored at or above average and above average. (Trial Tr. Vol. 2, 387:24- 388:10).

79.     On December 13, 2024, D.B. sent Ms. Willatt an e-mail stating "I would love to have a quick parent-teacher phone call/conference just to fill you in a bit more about stuff at home, things we're trying out to help her and what's working and what's not seeming to help much. I'd put it all in an e-mail, but it's nothing urgent, and it would be nice to talk to you in real-time as it is." (Trial Tr. Vol. 1, 45:18 – 46"1; Ex. 4).

80.     Ms. Willatt and D.B. thereafter had a phone conference wherein D.B. explained to Ms. Willatt that they were trying a different tactic at home by letting H.B. handle her assignments as opposed to D.B. constantly checking her assignments every night. D.B. did not relay anything to Ms. Willatt about H.B.'s mental health or suicide attempts, and there was no discussion about self-harm or bullying. (Trial Tr. Vol. 1, 46:17 – 47:2).

### Drama Club Incident

81.     In late February 2025 or March 2025, H.B. was involved in an incident at drama club. Ms. Dye did the investigation into the incident. There was a disagreement and physical contact between H.B. and another student, and after talking to both parties, it was found that both parties were at fault, and so the consequence was that both parties were removed from drama club for the rest of the year. (Trial Tr. Vol. 1, 95:11 – 96:22). The disagreement between H.B. and the other student arose because the other student was flirting with H.B.'s friend, and H.B. felt the need to protect her friend. (Trial Tr. Vol. 1, 11:17-22). Ms. Dye informed the parents of each student, and then Ms. Dye just conferred with the Assistant Principal, Ms. Cousin, about what had happened and how Ms. Dye had handled it. (Trial Tr. Vol. 1, 95:11 – 96:22). Ms. Dye has disciplinary authority to remove students from the drama club. (Trial Tr. Vol. 1, 116:11-16). The incident

constituted a minor altercation, and no blood was drawn from either party involved in the incident. (Trial Tr. Vol. 1, 100:16-21). This was not considered a "fighting incident". (Trial Tr. Vol. 1, 116:25 – 117:3). Over her ten (10) years as an educator, Ms. Dye described that minor altercations happen with some frequency in terms of pushing and shoving. (Trial Tr. Vol. 1, 109:12-16). And during her investigation of the incident, Ms. Dye did not discover any information that H.B. had made threats of serious harm or death toward the other student. (Trial Tr. Vol. 1, 110:7-12).

### Meeting Between Ms. Cousin, H.B., and S.B. in Late February / Early March 2025

82.     Sometime shortly after the drama club incident, Ms. Cousin met with H.B. and S.B. in Ms. Cousin's office. The meeting was specifically about the dust-up that occurred at the drama club meeting; it wasn't about anything else. H.B. and S.B. were both in the room for the first part of the meeting wherein Ms. Cousin asked H.B. to tell her side of the story in order to give due process, and H.B. told Ms. Cousin that she was taking up for a friend that another student had been bothering, and that the two students had engaged in shoving and H.B. jumped on the other student's back. No injuries were reported from the incident. (Trial Tr. Vol. 1, 167:1 – 168:3).

83.     H.B. did not express anything to Ms. Cousin about H.B.'s mental health, and there was no discussion about suicide attempts, self-harm, academic issues, or any other issues in school. (Trial Tr. Vol. 1, 168:11-23). S.B. did not bring anything up about cutting or scars of anything of a similar nature. (Trial Tr. Vol. 1, 190:5-7).

84.     S.B. disputes that she did not discuss H.B.'s cutting and self-harm at the meeting with Ms. Cousin, and S.B. agreed that the self-harm was not a reoccurring pattern all the way up until April 9, 2025 when H.B. was expelled. (Trial Tr. Vol. 1, 266:20-23). S.B. admitted that the last time she was aware of H.B. self-harming herself was sometime in November 2024 (4 months prior to her meeting with Ms. Cousin) when H.B. had a relapse with some minor superficial cuts.

(Trial Tr. Vol. 1, 265:9 – 266:19).  Per the testimony of S.B., this was not discussed in the meeting with Ms. Cousin.

85.    H.B. then left the room and Ms. Cousin and S.B. had a conversation that lasted approximately 10-15 minutes.  (Trial Tr. Vol. 1, 189:17:22).  S.B. was somewhat upset and had a few tears because H.B. was no longer allowed to be in drama club, which is something H.B. enjoys.  (Trial Tr. Vol. 1, 169:1-9).  During the discussion, there was no discussion by S.B. or request regarding any mental issues with H.B., nor did S.B. mention anything about self-harm or suicide attempts.  (Trial Tr. Vol. 1, 169:10-24).

86.    Moreover, S.B. made no requests for a mental health evaluation or any other sort of accommodations for H.B. in school to support her.  (Trial Tr. Vol. 1, 170:10-14).

87.    There was discussion about how students had made fun of H.B. for the way she dressed sometimes.  Ms. Cousin asked S.B. for the names of specific students so that the school could address it and take disciplinary action, if necessary, but S.B. did not provide any specifics.

88.    Prior to the incident involving H.B. in the drama club, there was never any other disciplinary incident involving H.B. at WBMS that involved H.B. being elevated to Ms. Cousin's office for discipline.  (Trial Tr. Vol. 1, 164:23 – 165:2).

### March 15, 2025 Suicide attempt at H.B.'s Home

89.    D.B. described a suicide attempt by H.B. that occurred on March 15, 2025 at H.B.'s home:

> On March 15th of this year, we answered the door at 1:00 A.M. to every parent's nightmare, a group of first responders asking if HB was home. We had let all the kids stay up late because it was the weekend, and I told them she had gone to bed at midnight and was asleep as far as I knew. The first responders let us know they were responding to a call that had been made by HB to a suicide crisis hotline. The intervention team came in and talked to HB for about half an hour and then transported her to St. Thomas Rutherford emergency room via ambulance for care and observation.

Following that visit, the interventionist, along with HB's therapist and pediatrician, worked with us to implement a safety plan for HB. Part of that plan included removing sharp objects from our home that HB might be able to use for self-harm. As a part of that safety plan we periodically check HB's bags for sharp objects. During our initial sweep of our house and HB's belongings the following day, we took safety pins, a pencil sharpener, and scissors from her school bag. We have not found other sharp objects in her room -- or bag or room since and have worked diligently to keep them out of our home. Or for items that are necessity, like our kitchen utensils, locked in a safe when not actively cooking. I do keep my work tool bag in my truck, but I always lock my vehicle.

(Trial Tr. Vol. 1, 254:4 – 255:10; Ex. 24).

90.     S.B. described this event as chaotic and traumatic. It caused her great concern as a parent. (Trial Tr. Vol. 1, 255:24 – 256:4; 258:9-10).

91.     A safety plan was thereafter generated for H.B. through Centerstone. (Trial Tr. Vol. 1, Ex. 20).

92.     However, crucially, S.B. did not reach out to Ms. Cousin, Ms. Sneed, or any other person at WBMS about the implementation of this safety plan. (Trial Tr. Vol. 1, 259:6-13).

93.     The safety plan was generated by Ms. Mitchell with Centerstone after Ms. Mitchell learned of an incident that did not happen at school where H.B. tried to end her life and the police were involved. Ms. Mitchell did not share this safety plan with RCS or WBMS. (Trial Tr. Vol. 1, 292:19 – 293:1)

94.     D.B. and S.B. implemented this safety plan. They secured all medications, and H.B. does not have access to any medications without parental supervision; they removed all sharp objects from their home and keep all knives secure; and they removed all of their guns from the home. (Trial Tr. Vol. 1, 259:16 – 260:10).

95. After H.B.'s March 15, 2025 suicide attempt, D.B. started checking H.B.'s bags every day before H.B. went to school and, per S.B., D.B. still permitted H.B. to bring the 4.5 – 5 inch fettling knife to school. (Trial Tr. Vol. 1, 255:12-23).

96. Ms. Cousin did not learn of H.B.'s suicide attempt until sometime after April 9, 2025 when she was told that H.B. had called the suicide prevention hotline when H.B. was at home, that H.B.'s parents were aware that H.B. had made the call and were taking the necessary steps to make sure H.B. was okay at home, and that this was something that was happening at home and not at school. However, no other details were provided. (Trial Tr. Vol. 1, 171:9 – 172:6).

97. Prior to April 9, 2025, Ms. Cousin had never seen the safety plan that was implemented following H.B.'s suicide attempt on March 15, 2025. Further, prior to April 9, 2025, H.B.'s parents never told Ms. Cousin that H.B. could not be around sharp objects or could not be around tall buildings or bridges. Had this safety plan and information regarding H.B.'s suicide attempt been presented to Ms. Cousin, she would have made sure that H.B.'s teachers were aware so they could monitor H.B. to make sure she was safe, and it would have elevated her concerns and caused her to look into whether other supports were needed. Ms. Cousin absolutely wishes that H.B.'s parents would have told Ms. Cousin this information, as it would have been helpful in dealing with H.B. on April 9, 2025 (described further below). (Trial Tr. Vol. 1, 172:7-14).

98. If the school had that information, the school would have most definitely have said "do we need to get something in place here?" H.B.'s parents could have told the school "hey, this is what we are seeing, we're needing supports", but the parents' request to the school was not to assist. The school went above that by providing the parents with mental health resources, and H.B. was already seeing a therapist at Centerstone. (Trial Tr. Vol. 1, 197:12-22). If the Centerstone

therapist had said, "hey, this is getting bigger than just at home", then something more could have been done, but the school was not provided any of that information. (Trial Tr. Vol. 1, 198:3-6).

99. From what WBMS was told, the parents did not want this information in H.B.'s educational record or IEP. (Trial Tr. Vol. 1, 197:23 – 198:2).

100. On March 20, 2025 (over three (3) months later from his previous e-mail to Ms. Willatt on December 13, 2024), D.B. sent Ms. Willatt another e-mail regarding certain schoolwork, and also stated "I don't know if she told you about this past weekend, but I kind of doubt it. It was a tough one. Without getting into the details, and please just between us and not mentioning to H.B. unless she brings it up, they've placed her on the suicide watch list, which means [Ms. Mitchell] will be pulling her out of class at least once every week now." (Trial Tr. Vol. 1, 49:9-16; Ex. 5).

101. Apart from this e-mail exchange and another that occurred on March 26, 2025, neither D.B. nor S.B. relayed information about or otherwise sought to discuss the incident referenced in the March 20, 2025 email from D.B. (Trial Tr. Vol. 1, 51:16-23).

102. In the March 20, 2025 e-mail exchange, Ms. Willatt indicated to that she noticed that H.B. seemed down lately (but was not crying) but that H.B. said she was just tired; however, it is normal for student's to put their head down and to say they are tired and to appear a little down, and Ms. Willatt never reported this to anybody because H.B. did not exhibit anything out of the ordinary for H.B. (Trial Tr. Vol. 1, 52:2 – 53:11).

103. Ms. Willatt recalls one occasion where she observed H.B. not happy as a result of a friend moving away. Teens are kind of angsty, and so a lot of students would come in and be off some days and then ok other days because of what goes on in their relationships, and her

observations of H.B. did not stick out to her where she thought she needed to go and report it. (Trial Tr. Vol. 1, 62:25 – 63:5).

104.     Ms. Willatt did not report the March 20, 2025 e-mail or the information contained therein to any school counselor, the Principal (April Sneed), the Assistant Principal (Rebecca Cousin), the RCS Director of Special Education (Annie Ralston), nor anyone else.  (Trial Tr. Vol. 1, 50:20 – 51:15).

105.     Four (4) days later on March 24, 2025, D.B. e-mailed another of H.B.'s teachers, Hannah Garrard ("Ms. Garrard"), with S.B. and Ms. Willatt copied, that stated "Ms. Willatt is other teacher we brought into our ***trust circle*** about H.B.'s struggles with depression and self-harm.  I've copied her on this email just to keep her in the loop.  ***Her therapist pulls her out for sessions during Ms. Willatt's class, which used to be a couple times a month but now will be at least once a week***.  So the two of you are both in the know at this point, but again, ***it's extremely important that it stays private information between us.***  H.B.'s drawing is also part of her coping mechanisms and escapism, so if there's a way to steer it towards both her learning benefit along with her mental well-being, I am all for any ideas on how to guide and encourage her with that."  (Trial Tr. Vol. 1, Ex. 6) (emphasis added).

106.     Ms. Willatt did not report this e-mail or the information contained therein to the school counselor, the Principal (April Sneed), the Assistant Principal (Rebecca Cousin), or anyone else in the RCS special education department.  (Trial Tr. Vol. 1, 55:1-19).

107.     Following H.B.'s expulsion on April 9, 2025, D.B. sent Ms. Willatt some e-mails where he gave Ms. Willatt accolades about her being a very good teacher, and Ms. Willatt felt like she had a pretty good relationship with H.B.'s parents and that they trusted her.  (Trial Tr. Vol. 1, 56:7-22).

108.    If anything was of a true concern regarding H.B., Ms. Willatt would have reported it.  (Trial Tr. Vol. 1, 56:23 – 57:2).

### Discovery of Threatening Text Messages and Knife on April 9, 2025

109.    The threatening text messages from H.B., (Trial Tr. Vol. 1, Ex. 7), were delivered by the Centerstone therapist, Ms. Mitchell, to Ms. Cousin on the morning of Wednesday, April 9, 2025.  (Trial Tr. Vol. 1, 118:22 – 120:1; 122:21 – 123:2).  Ms. Mitchell did not provide any context for H.B.'s text messages; Ms. Mitchell just told Ms. Cousin that she (Ms. Mitchell) received these, (Trial Tr. Vol. 1, 127:17:23), and told Ms. Cousin "I'm worried about everyone involved and people in the school", (Trial Tr. Vol. 1, 314:23-25).  Ms. Cousin read them on Ms. Mitchell's phone while Ms. Mitchell was standing with her.  (Trial Tr. Vol. 1, 127:17:23).  Ms. Cousin thereafter took screenshots of the text messages on her own phone.  (Trial Tr. Vol. 1, 128:1-10).  Ms. Mitchell told Ms. Cousin that she didn't know what to do with this information, and Ms. Cousin told her that they (the school) would take care of it, that she (Ms. Cousin) would talk to the Principal April Sneed, and that there was nothing further that Ms. Mitchell needed to do.  (Trial Tr. Vol. 1, 129:3-8; 130:11-12).

110.    Ms. Mitchell began seeing H.B. in September 2023 until April 9, 2025.  Prior to April 9, 2025 in her therapy sessions with H.B., Ms. Mitchell did not ever have a need to contact the crises intervention hotline for H.B.  (Trial Tr. Vol. 1, 285:2 – 286:8).  If H.B. had ever described a plan to self-harm herself, Ms. Mitchell would have gotten the school involved, but that never happened with H.B.  (Trial Tr. Vol. 1, 286:9-24; 13-15).  Ms. Mitchell never diagnosed H.B. with any sort of mental health disability prior to April 9, 2025, (Trial Tr. Vol. 1, 288:5-8), and there are students that don't have a mental health disability that qualifies them for an IEP that still used her services, (Trial Tr. Vol. 1, 289:25 – 290:8).  In fact, out of her entire caseload during her time at

WBMS, there were maybe ten (10) students that had an IEP and maybe 10-15 that had 504 plans. (Trial Tr. Vol. 1, 304:4-23).  During her time treating H.B., Ms. Mitchell is not aware that the parents ever complained about her ability to be a therapist for H.B.  (Trial Tr. Vol. 1, 289:21-24).

111.    Prior to her receipt of the text messages from H.B. to Ms. Mitchell, H.B. had never said something similar to Ms. Mitchell before.  (Trial Tr. Vol. 1, 295:2-6).

112.    Per Ms. Mitchell, the content of the text messages from H.B. was extremely out of character for her.  (Trial Tr. Vol. 1, 298:3-8).

113.    The text messages disturbed Ms. Mitchell, and she tried to mentally block out what was happening and all the hateful and hurtful things being said to her.  In fact, Ms. Mitchell left work early that day because of these events.  (Trial Tr. Vol. 1, 300:5-16).

114.    Prior to receiving these text messages from H.B., Ms. Mitchell had not alerted Mr. Lyons or Ms. Malcom (WBMS 504 Coordinator) of any real concern regarding H.B.'s mental health.  (Trial Tr. Vol. 1, 301:20-23).

115.    Ms. Mitchell also never relayed anything about the March 2025 drama club incident to the school.  (Trial Tr. Vol. 1, 301:24 – 302:6).

116.    While Ms. Mitchell saw things escalating with H.B. after the drama club incident in her therapy sessions with H.B., Ms. Mitchell did not relay anything to the school system, and even when she relayed the threatening text messages to Ms. Cousin on April 9, 2025, Ms. Mitchell did not say anything like "This has been building up since this." *Per Ms. Mitchell, other than Ms. Mitchell sending the threatening text messages to Ms. Cousin, Ms. Mitchell does not believe that the school was aware of any accelerating stress or drama since the drama club incident*.  (Trial Tr. Vol. 1, 325:11 – 327:11) (emphasis added).

117. One of Ms. Cousin's primary roles is student discipline and safety. (Trial Tr. Vol. 1, 162:15-18).

118. Ms. Cousin did not know what H.B. and Ms. Mitchell spoke about during a counseling sessions that apparently occurred on Monday, April 7, 2025. (Trial Tr. Vol. 1, 124:18 – 125:4).

119. After receipt of the threatening text messages, Ms. Cousin relayed the text messages to Ms. Sneed, and thereafter Ms. Cousin performed a safety check on H.B. Ms. Cousin got H.B. and her belongings from class and they went to Ms. Cousin's office to conduct the safety check with another person present as a witness. (Trial Tr. Vol. 1, 131:2-10). Ms. Cousin thereafter discovered a 4.5 – 5 inch fettling knife in H.B.'s bookbag. (Trial Tr. Vol. 1, Ex. 13).

120. Ms. Cousin asked H.B. where she got the knife and why it was in her bag at school, and H.B. said "Oh, I didn't know it was in there. Mom and Dad have been checking my bag." H.B. told Ms. Cousin that it was a carving knife or carving tool that had been in her backpack since Christmas. (Trial Tr. Vol. 1, 132:10 – 133:22).

121. Neither on April 9, 2025 nor prior thereto had Ms. Cousin ever noticed any sort of self-harm on H.B. when she saw her in the hallways or elsewhere. (Trial Tr. Vol. 1, 164:8-15).

122. Prior to April 9, 2025, neither S.B. or D.B. ever asked Ms. Cousin for any sort of evaluation or any sort of additional accommodations for H.B. (Trial Tr. Vol. 1, 165:3-6).

123. Apart from the meeting in late February 2025 or early Marcy 2025 described above between S.B. and Ms. Cousin, Ms. Cousin had spoken to H.B.'s parents on occasion when they were in the building, but none of the conversation were for a formal reason, including discipline or anything else of concern. To this point, H.B.'s parents never had a conversation with Ms. Cousin

about self-harm, suicide, mental health issues, depression, or anxiety. (Trial Tr. Vol. 1, 165:13 – 166:3).

124.     Prior to April 9, 2025, Ms. Cousin had never received any reports from any of H.B.'s teachers that H.B. was failing or having trouble accessing the curriculum. Further, no school counselor or other teacher reported to Ms. Cousin that H.B. needed any additional supports. (Trial Tr. Vol. 1, 170:24 – 171:8).

### Disciplinary Decision and Threat Assessment

125.     Because of the threatening text messages and the knife found in H.B.'s bag that was identified as something that could be used as a weapon that wasn't a firearm, Ms. Cousin proceeded to the next disciplinary step by looking at the student code of conduct with Ms. Sneed where it was confirmed that it was zero tolerance as reasoned judgment offense because of a weapon other than a firearm. (Trial Tr. Vol. 1, 135:8-22; Ex. 14).

126.     Under the RCS Zero Tolerance Offenses Policy, (Trial Tr. Vol. 1, Ex. 14), for reasoned judgment offenses, RCS has identified other zero tolerance offenses that, depending on the individual circumstances, may be a reasoned judgment by the Principal in assigning discipline, and these offenses may result in suspension, remandment, or expulsion up to one (1) year. (*Id.*). Under the policy, a reasoned judgment offense includes weapons other than firearms. (*Id.*). Thus, a reasoned judgment offense still falls under zero tolerance, but it gives the Principal some discretion. (Trial Tr. Vol. 1, 140:7-10).

127.     After consulting RCS' Zero Tolerance Policy, (Trial Tr. Vol. 1, Ex. 14) and Code of Conduct Policy, (Trial Tr. Vol. 1, Ex. 19), Ms. Cousin conferred with Ms. Sneed and the decision was made to expel H.B. for one (1) year for a zero tolerance offense—weapon other than a firearm. (Trial Tr. Vol. 1, 140:15-23). This was due, in part, out of concern for the safety and welfare of

the school, (Trial Tr. Vol. 1, 164:1-3), because both H.B.'s text messages and the discovery of the knife (which could be used as a dangerous weapon) factored into the decision. (Trial Tr. Vol. 1, 182:5-13). Knowing that Ms. Cousin is responsible for 120 staff members and almost 800 students, the text messages themselves were very alarming and very concerning for safety purposes, and then finding an item that could be used to harm someone and after reading the text messages, Ms. Cousin had to make sure everyone was safe. (Trial Tr. Vol. 1, 184:22 – 185:12).

128. When RCS typically finds a pattern of behavior, it involves something that is happening more than one day at a time. For example, a student has gone to in-school suspension ("ISS") for a day, then they back to class, and they get in trouble again. In other words, the pattern continues and it doesn't get better after disciplinary actions, interventions, conferences with school counselors, or conferences with parents and teachers. If Ms. Cousin were looking at H.B. having a pattern of behavior, it would have been more than just one (1) disciplinary action. If there is a pattern of behavior, the behavior would be happening multiple times or over multiple days. A pattern is not just having one instance. H.B. had been at WBMS since 6th grade, and she had not had a pattern of misbehavior or anything negative happening with H.B. (Trial Tr. Vol. 1, 193:3 – 194:24).

129. H.B. was a student role model. H.B. had been on school announcements, and H.B.'s mother was even on the WBMS' welcoming message that the school used at the beginning of the school year. (Trial Tr. Vol. 1, 194:19-24).

130. From October 3, 2024 through April 9, 2025, Ms. Cousin did not feel like she had sufficient information with which to deduce a pattern of any sort of disciplinary or erratic or other concerning behavior by H.B. that would have led her to believe that H.B. had a mental health disability. And apart from the information about the one self-harm incident contained in D.B.'s e-

mail to Ms. Willatt on October 3, 2025, there was no other instance of which Ms. Cousin was made aware that there were any mental health issues going on with H.B. In the end, up until April 9, 2025, Ms. Cousin did not have information that would cause her a concern for H.B.'s safety or the safety of people in the building or H.B. harming herself or others. (Trial Tr. Vol. 1, 186:25 – 188:22).

131.    After reviewing the text messages from H.B. to Ms. Mitchell, which Ms. Willatt had not previously seen, the same made Ms. Willatt sad, and to Ms. Willatt the content of the text messages reflect that H.B. was much sadder than Ms. Willatt knew. Ms. Willatt did not have any prior indication that H.B. would ever send text messages of this nature. (Trial Tr. Vol. 1,59:14 – 60:1; Ex. 7).

132.    After reviewing the text messages from H.B. to Ms. Mitchell, which Ms. Dye had not previously seen, Ms. Dye felt that the content in the same seemed very out of character for H.B. and, after having seen them, cause her concern as an educator, (Trial Tr. Vol. 1, 105:23 – 107:2; Ex. 7), as Ms. Dye has never experienced the level of aggression shown by H.B. in the text messages. (Trial Tr. Vol. 1, 108:18-24).

133.    Ms. Cousin thereafter notified H.B.'s mother, S.B., on April 9, 2025 that stated "A report was received that H.B. threatened her therapist that works in the school via a text last night. Text messages attached. A safety check was completed, and a knife was found in her bag. H.B. admitted to having the knife in her bag since Christmas break. H.B. was given due process verbally and in writing." (Trial Tr. Vol. 1, 140:24-25; Ex. 15).

134.    Ms. Cousin did not initially issue a "suspension" for H.B. and thereafter move it to an "expulsion". The action was zero tolerance expulsion for one (1) year as soon as the disciplinary action was given, as reflected in the suspension notification documentation provided to S.B. (Trial

Tr. Vol. 1, 148:18-24; Ex. 15). RCS does not have separate notification forms for "suspension", "remandment", or "expulsion"; instead, all of those fall under the same suspension notification document, and on the notification provided to S.B. it says "zero tolerance", which meant expulsion for one (1) year. (Trial Tr. Vol. 1, 175:9 – 176:3). At any rate, the suspension notification provided to S.B. stated the following: "Zero Tolerance: A parent/guardian may ask the Director of Schools to modify or change a zero-tolerance penalty. This request should be submitted in writing within five (5) days of the beginning suspension date. ***A zero-tolerance expulsion will be in effect for a full calendar year form the date of the offense unless modified by the Director of Schools.***" (Trial Tr. Vol. 1, Ex. 15) (emphasis added).

135.     S.B. acknowledged that the suspension notification contained the word "expulsion". (Trial Tr. Vol. 1, 234:7-14).

136.     S.B. was also provided a "Receipt of information for parent/guardian) document on April 9, 2025 that listed "zero tolerance"; S.B. acknowledged by signing the document that S.B. understood that if she did not request modification to the director of schools of the zero tolerance that H.B. would not be allowed to attend a Rutherford County School for one (1) calendar year. (Trial Tr. Vol. 1, Ex. 21). Moreover, Ms. Cousin verbally told S.B. that it was an expulsion for one (1) calendar year. (Trial Tr. Vol. 1, 150:4 – 151:6).

137.     The "Receipt of information for parent/guardian) document, (Trial Tr. Vol. 1, Ex. 21), also listed a designated amount of infraction points that would come into play if H.B. went to an alternative school as a result of a modification of H.B.'s zero tolerance expulsion by either the Director of Schools, the RCS Disciplinary Authority, or the Board of Education. Ms. Cousin was involved in H.B.'s modification appeal to both the RCS Disciplinary Authority and the Board of Education, and both upheld H.B.'s zero tolerance expulsion. (Trial Tr. Vol. 1, 176:14 – 178:25).

138.    Per S.B., up through April 9, 2025, she had not ever sent a written request to WBMS or RCS for any sort of evaluation or a 504 accommodation plan.  (Trial Tr. Vol. 1, 261:19-24).

139.    Upon learning of H.B.'s discipline, and up until the filing of the Due Process Complaint, S.B. did not request the RCS perform any sort of mental health evaluation for H.B. or a manifestation determination, even despite D.B. and S.B. being very involved in the disciplinary appeal process during the Summer of 2025.  (Trial Tr. Vol. 1, 268:21-16).

140.    Following H.B.'s expulsion, a threat assessment was performed. (Trial Tr. Vol. 1, Ex. 18).  The threat assessment is primarily based on the interviews with the student and the parents.  The purpose of conducting a threat assessment is not for purposes of disability eligibility but instead for purposes of what sort of safety precautions the school needs to put in place if and when the student returns to school.  (Trial Tr. Vol. 1, 182:24 – 183:9-16; Trial Tr. Vol. 2, 365:21 – 366:1).

141.    Hafsa Abed ("Ms. Abed"), a social worker for RCS, was on the threat assessment team and conducted the threat assessment interview of D.B. and S.B.  (Trial Tr. Vol. 2, 350:23 – 351:3).  Ms. Abed had never met H.B., D.B., or S.B. prior to the threat assessment.  (Trial Tr. Vol. 2, 349:22-24; 365:5-7).

142.    The assessment is a snapshot in time based on the information that is being obtained when the interviews and the assessment are being conducted, and the assessment is not indicative of what the school knew prior to the threat assessment.  (Trial Tr. Vol. 2, 353:20 – 354:10).

143.    In response to the interview question to D.B. and S.B. of "What are you planning to do about the threat", the parents' response was "Mom contacted Centerstone therapist supervisor to come into home three times a week, waiting to hear about referral to be fully evaluated for any diagnosis."   Further, H.B.'s parents did not say anything in the interview that H.B. had been

diagnosed with any mental health disability prior to April 9, 2025.  (Trial Tr. Vol. 2, 355:3-17; Ex. 18).

144.    In response to the interview question of whether H.B. ever needed special help in school, the parents answered "no".  (Trial Tr. Vol. 2, 356:8-20; Ex. 18).

145.    In response to the questions about delinquent behavior, H.B.'s parents answered "no".  (Trial Tr. Vol. 2, Ex. 18).

146.    In response to the questions about history of aggression, H.B.'s parents answered "no".  (Trial Tr. Vol. 2, Ex. 18).

147.    H.B.'s parents confirmed in the interview that H.B. did not have problems paying attention or following directions or completing activities.  (Trial Tr. Vol. 2, Ex. 18).

148.    H.B.'s parents also indicated that H.B.'s mood was up and down over the last 4-5 months but that H.B. had been that way her whole life.  They also answered "no" to the question of whether H.B. was unusually nervous or anxious.  (Trial Tr. Vol. 2, Ex. 18).

149.    The threat assessment team found that H.B.'s threat was a "transient threat", meaning a low-level threat, and that H.B. did not have a plan or intention to carry out the threat. (Trial Tr. Vol. 2, 366:12 – 367:8).

150.    Following the Threat Assessment, no person on the threat assessment team came to Ms. Cousin and said that H.B. should be returned to school, and Ms. Cousin didn't "overrule" them.  The other members of the threat assessment team do not have the authority to assign any discipline; that is a matter for the Administration.  (Trial Tr. Vol. 1, 183:17 – 184:15).  Ms. Abed did not tell H.B.'s parents that H.B. could come back to school following the threat assessment. (Trial Tr. Vol. 2, 364:10-17).

151.     After being asked to attend the threat assessment following H.B.'s expulsion, Ms. Townsend, who was on the threat assessment team, was really surprised because what she learned did not align with what Ms. Townsend had perceived of H.B. in class.  (Trial Tr. Vol. 2, 383:3-11).

152.     In this case, following H.B.'s expulsion, if there had there been a manifestation determination conducted for H.B., and if it was determined that the conduct was a manifestation of a disability, then H.B. would not have been expelled for a full calendar year but instead may have gone to an alternative school or something of that nature.  (Trial Tr. Vol. 1, 145:14-23).

153.     The October 2024 e-mails from Mr. Lyons, (Trial Tr. Vol. 1, Ex. 2 and Ex. 9), the drama club incident and meeting with mom in late February 2025 or early March 2025, and the April 9, 2025 threatening text messages spanned a time frame of six (6) months and were sporadic incidents that were far apart temporally in time.  (Trial Tr. Vol. 1, 201:21 – 202:5).

154.     After having provided therapy services to H.B. over the course of almost 2 years, Ms. Mitchell's professional opinion is that, at this point, H.B. should not be allowed back into school in order to protect the safety of others.  (Trial Tr. Vol. 1, 302:18-24).

155.     Annie Ralston is the RCS special education coordinator for the last four (4) years. At no point during her tenure did either D.B. or S.B. request a meeting with her to discuss any sort of special education services for H.B.  In addition, during that same time period, no teacher that taught H.B. approached her with any concerns that they had regarding H.B.  (Trial Tr. Vol. 2, 389:6 – 390:5).

156.     S.B. confirmed that a reason she did not take steps to apprise WBMS administration of all the things going with H.B. was that she was concerned about teacher gossip and the risk of H.B. being treated differently in the classroom.  (Trial Tr. Vol. 2, 395:4-19; 396:14-18).  Notably,

S.B. does not have any evidence that H.B. was treated differently because of anything that has been discussed in this case. (Trial Tr. Vol. 2, 396:19 – 397:1).

157. S.B. admitted that she could have had a closed-door meeting with Ms. Cousin after the March 15, 2025 suicide attempt to explain to Ms. Cousin what had happened and that there was a problem and that something needed to be done, but S.B. did not do so. (Trial Tr. Vol. 2, 397:2-17).

158. S.B. admitted that she was not hampered in any way in bringing information to the WBMS Administration at any point during H.B.'s 8th grade year. (Trial Tr. Vol. 2, 395:10-22). By her own admission (which is disputed by Ms. Cousin), S.B. confirmed that the first time she ever relayed anything to WBMS Administration about bullying or issues with H.B.'s mental health was in the meeting with Ms. Cousin in late February or early March 2025. (Trial Tr. Vol. 2, 396:8-13).

**Due Process Proceeding**

159. On September 11, 2025, Defendants filed a Due Process Complaint (Exhibit "3") with the Tennessee Administrative Procedures Division alleging that RCS had a basis of knowledge for H.B.'s alleged disability prior to her expulsion and failed to conduct a Manifestation Determination Review ("MDR") prior to disciplining H.B. in violation of the IDEA and Section 504.

160. Defendants' sole claim in their Due Process Complaint was that RCS failed to conduct an MDR prior to disciplining H.B. The Due Process Complaint did not allege a failure to evaluate.

161.    After the Due Process Complaint was filed on September 11, 2025, the parties pivoted to preparing for an expedited hearing.  Neither Defendants nor their counsel contacted RCS during this time to request or coordinate any form of evaluation.

162.    On October 1, 2025, the Hearing Tribunal ordered a third-party mental health assessment as part of the "stay put" issue, requiring an independent professional to determine whether H.B. posed a safety risk before any return to school.

163.    On October 2, 2025, the RCS Threat Assessment was produced in discovery and Defendants moved to strike the tribunal's mental health assessment requirement as "unnecessary."

164.    The parties attended a pre-hearing conference on October 13, 2025 and the Hearing Tribunal thereafter issued the Order attached hereto as Exhibit "4" on October 14, 2025, requiring that RCS conduct an expedited mental-health assessment "to determine whether H.B. has any mental-health exceptionality, such as emotional disturbance, that requires special-education services."  This was the first time the Tribunal, or any parent or attorney, formally asked RCS to conduct an eligibility evaluation.

165.    The due process hearing, which involved numerous school personnel witnesses, convened on October 15, 2025. However, it did not conclude and was scheduled to reconvene on October 24, 2025.

166.    RCS, through counsel, sent Defendants' counsel evaluation paperwork for H.B. on October 23, 2025.

167.    The Due Process hearing concluded on October 24, 2025.

168.    Having not received a response regarding the evaluation paperwork, RCS' counsel followed up with Defendants' counsel on November 4, 2025.  Defendants' counsel did not provide

signed evaluation paperwork to RCS until November 11, 2025 (a total passage of nineteen (19) days from when RCS provided the paperwork to Defendants).

169.    On November 10, 2025, the Tribunal entered the Final Order attached as Exhibit "5".

170.    RCS and Defendants both filed Petitions for Reconsideration of certain portions of the Final Order. (Exhibits "6" and "7").

171.    Defendants' Petition for reconsideration requested reconsideration of the Section 504 claim only, arguing that Section 504 differs from the standard under the IDEA and requesting specific findings as to the Section 504 claim.

172.    RCS' Petition for Reconsideration requested reconsideration of the portions of the Final Order challenged in this action.

173.    On November 19, 2025, the Tribunal issued an Order Ruling on Petitions for Reconsideration of Final Order, attached hereto as Exhibit "8".

174.    The November 19, 2025 Order stated that "The Final Order will be reissued to clarify that the evaluation, ordered on October 14, 2025, should include, not exclude, any Section 504 basis for eligibility. Additionally, the revision will state that the evidence presented at trial was insufficient to establish that H.B. has a disability under Section 504 that RCS should have reasonably suspected." The Tribunal denied RCS' request for reconsideration of the portions of the Final Order challenged herein.

175.    The Tribunal entered an Amended Final Order on November 20, 2025, which is attached as Exhibit "9" ("Final Order").

176.   Defendants filed a second Petition for Reconsideration on December 5, 2025 regarding the Section 504 claim (Exhibit "10"), which was denied by Order dated December 11, 2025 (Exhibit "11").

**Final Order**

177.   The Tribunal correctly recognized that April 9, 2025 was the operative date for Defendants' claims (Final Order at p. 16), because that is the date on which RCS determined and entered the expulsion.

178.   A manifestation determination is a discipline-specific procedure under the IDEA, 20 U.S.C. §1415(k) and 34 C.F.R. §300.534, applicable only when a district already knows or is deemed to know the student has a disability before the conduct occurred. If no knowledge existed before the conduct, the district may discipline the student as a nondisabled peer. *See* 34 C.F.R. §300.534(d).

179.   The Tribunal correctly found that no basis of knowledge existed before April 9, and Defendants did not challenge that factual finding.

180.   Ultimately, the Tribunal correctly found that Defendants had "failed to carry the burden of proof and show, by a preponderance of the evidence, that H.B. was a child with a disability to invoke IDEA or Section 504 discipline protections or a manifestation determination review." (Final Order at p. 19).

181.   Thus, RCS was the prevailing party on the sole issue presented in the Due Process Complaint—whether RCS failed to conduct a manifestation determination prior to H.B.'s suspension on April 9, 2025.

## Challenged Portions of the Final Order

182.     Notwithstanding RCS prevailing on the sole issue raised in the Due Process Complaint, the Tribunal's Final Order concluded the following:

> [I]f the assessment . . . indicates that H.B. has a disability and that her conduct was related to that disability, the school must immediately end the expulsion and re-enroll H.B. in the appropriate general education class . . .

(Final Order, at p. 19-20).

183.     The IDEA does not provide that, where a school lacked knowledge of a student's alleged disability prior to imposing discipline and the student is evaluated during a disciplinary placement, a subsequent finding that the student is eligible for services requires the previously imposed discipline to be retroactively undone.

184.     The Tribunal's conclusion that H.B. was entitled to automatic re-enrollment at RCS if she was found eligible for services and if H.B.'s conduct was a result of a disability (*e.g.*, a MDR) is erroneous and not supported by applicable law.

185.     RCS petitioned the Tribunal to reconsider this portion of the Final Order mandating that H.B. be returned to her previous general education if she was found eligible for services and if H.B.'s conduct was a result of a disability (*e.g.*, a MDR), but the Tribunal declined to do so.

186.     The requirement of a manifestation determination under the IDEA does not apply where, as here, the LEA had no knowledge that the student was a child with a disability before the behavior that precipitated the discipline occurred.  20 U.S.C. § 1415(k)(5)(A)–(C); 34 C.F.R. § 300.534(b).

187.     RCS petitioned the Hearing Tribunal to reconsider the language in its Final Order stating that "if the assessment ordered on October 14, 2025, indicates . . . ***that her conduct was related to that disability***," as that language incorrectly implies that RCS must conduct a

manifestation determination based on a disability that was entirely unknown at the time of the misconduct. However, the Tribunal declined to do so.

188.    The Tribunal also concluded the following:

> The assessment [ordered on October 14, 2025] should have been expedited beginning September 11, 2025. Depending on the evaluation's outcome, the Petitioners may be the prevailing parties on issues of compensatory education, reimbursement for educational costs, and other related remedies. 20 U.S.C.A. § 1415 (k)(5)(D)(ii).

(Final Order, at p. 20).

189.    The record does not support the Tribunal's finding that H.B. was entitled to an expedited assessment as of September 11, 2025.

190.    The evaluation provision is triggered only "when a request for an evaluation of a child is made during the time period in which the child is subjected to disciplinary measures." 34 C.F.R. § 300.534(d)(2)(i); 20 U.S.C. § 1415(k)(5)(D)(ii).

191.    Defendants never requested an evaluation from RCS at any time between April 9, 2025 and September 11, 2025.

192.    The first time "evaluation" was raised by Defendants was in the relief section of their September 11, 2025 Due Process Complaint, five (5) months after the disciplinary decision.

193.    By the time this first mention of "evaluation" was made by Defendants, H.B. had already missed almost a complete semester of school.

194.    Defendants did not bring this request for relief to RCS's attention or indicate that they were seeking an immediate expedited evaluation by the district under 34 C.F.R. § 300.534(d)(2)(i).

195.    In their Due Process Complaint, Defendants cited numerous statutory and regulatory provisions governing manifestation determination reviews and disciplinary removals,

but they never cited 34 C.F.R. § 300.534(d)(2)(ii) or otherwise invoked the IDEA's expedited-evaluation provisions.

196.    Defendants failed to provide the notice required by Tenn. Code Ann. § 4-5-307(b)(2)–(3) that a failure to evaluate claim would be at issue in this case, and a failure to evaluate claim was never properly before the Tribunal.

197.    Evaluation was not mentioned again until the pre-hearing conference on October 13, 2025.

198.    RCS's obligation to evaluate H.B. arose only after the Hearing Tribunal's October 14, 2025 Order.

199.    RCS acted without delay to obtain consent and coordinate assessments per the Hearing Tribunal's October 14, 2025 Order.

200.    Because RCS complied with the IDEA's evaluation requirements once the same arose, Defendants are not entitled to any relief.

201.    RCS petitioned the Tribunal to reconsider the portion of the Final Order suggesting that Defendants may be entitled to relief depending on the results of the evaluation, but the Tribunal declined to do so.

### Subsequent Events

202.    The IDEA provides that when a child is evaluated during a disciplinary placement, the child must "remain in the educational placement determined by school authorities" pending completion of the evaluation and any related proceedings. 20 U.S.C. § 1415(k)(5)(D)(i); 34 C.F.R. § 300.534(d)(2)(ii). Thus, H.B. could not return to school until after the evaluation process concluded.

203. Efforts of RCS to coordinate H.B.'s evaluation were delayed by the actions of Defendants and the timing of Thanksgiving break and winter break.

204. When Defendants finally provided signed evaluation paperwork to RCS on November 11, 2025, there was less than a month of school left in the semester. Thanksgiving Break ran from November 24-28 (which are no-school days), and December 18 was the final full day of school prior to Winter Break.

205. After Defendants provided the signed evaluation paperwork to RCS, counsel for Defendants and counsel for RCS communicated regularly to coordinate dates of evaluations and discuss the logistics of observations, the use of prior teacher data, and the distinction between IDEA evaluation requirements and Section 504 eligibility.

206. RCS proposed multiple dates for eligibility meetings and offered flexibility regarding observation settings and data sources in light of H.B.'s expulsion and lack of access to a traditional classroom environment.

207. Defendants' counsel raised objections to alternative settings but did not propose a workable substitute, which delayed completion of observation components.

208. On December 15–18, 2025, RCS provided Defendants' counsel with evaluation materials and records in advance of the eligibility meeting, sought confirmation regarding waiver of the 48-hour advance report requirement, and outlined proposed timelines for completing the eligibility determination.

209. RCS also worked to coordinate an MDR in compliance with the Tribunal's Final Order. However, RCS continues to take the position that no post-hoc MDR was required under the IDEA or Section 504.

210.    Attached hereto as Exhibit "12" is an email thread between counsel for the parties that substantiates the timeline recited above.

211.    On December 16, 2025, Defendants filed an "Emergency Motion to Hold a Manifestation Determination Review (MDR) This Week". A hearing was held on said Motion on December 17, 2025 before The Honorable Judge Hilliard. The discussion centered around whether Defendants would agree for RCS to use past teacher observation data from before H.B. was expelled for purposes of said eligibility meeting, as well as when and MDR would be scheduled assuming the IEP Team found H.B. eligibility for a disability.  RCS suggested that the parties wait to see if H.B. became eligible before scheduling an MDR and that, if H.B. was found eligible on December 18, 2025, that it would not harm or prejudice HB for the MDR to be held after Winter Break.

212.    Defendants, through counsel, agreed that the MDR could wait until after Winter Break, and the Hearing Tribunal requested that Petitioners' counsel file something withdrawing Petitioners' "Emergency Motion to Hold a Manifestation Determination Review (MDR) This Week".

213.    The Hearing Tribunal thereafter followed up with Defendants' counsel via e-mail on December 23, 2025 stating "I presume there is no longer a need for the motion to hold an MDR to be adjudicated. If I am correct, please make a filing first of next week to memorialize that outcome."  Defendants never filed anything, and so the Hearing Tribunal, *sua sponte*, issued an Order on January 6, 2026 denying Defendants' Motion as moot.

214.    RCS staff returned to work on January 5, 2026. The next day, on January 6, 2026, an MDR committee assembled and conducted an MDR.

215.    RCS conducted the MDR solely in compliance with the Hearing Tribunal's Final Order and does not concede that a post-hoc MDR was required, that H.B. was entitled to re-enrollment in the general school population, or that the underlying disciplinary decision was improper.

216.    The MDR team concluded that "upon considering the data [the school] has now, which the school did not have at the time of the incident or imposition of the discipline, there is a substantial relationship between the behavior and [H.B.]'s disability" and that "the behavior on 4/9/25 was likely a manifestation of [H.B.]'s disability".

217.    The MDR determined that a behavior intervention plan (BIP) was not needed, but generated a safety plan for implementation when H.B. returned to school.

218.    In compliance with the Tribunal's Final Order requiring that H.B. be returned to the appropriate general education classes, RCS permitted H.B. to enroll at Riverdale High School on January 7, 2026.

219.    ***H.B.'s IEP team, including H.B.'s parents, agreed that no provisions related to H.B.'s behavior needed to be included in H.B.'s IEP because there was no educational impact to address. H.B.'s IEP reflects that H.B. is "technically eligible" for services for Emotional Disturbance, but "no accommodations needed at this time."***

220.    ***H.B.'s Section 504 team, including H.B.'s parents, agreed that no provisions related to H.B.'s behavior needed to be included in H.B.'s 504 Plan because there was no educational impact to address. H.B.'s IEP reflects that H.B. is "technically eligible" for Section 504 accommodations, but "no accommodations needed at this time."***

221.    H.B. remains on track to graduate on time, is currently enrolled in the same core courses she would have taken absent the expulsion, and does not require summer school or additional remediation.

222.    On January 8, 2026, Defendants filed a "Motion to Record H.B.'s Change of Status and Obtain Remedy ('Judicial Imprimatur')," attached as Exhibit "13", seeking a declaration of prevailing party status on the evaluation issue and an award of relief.

223.    On January 19, 2026, RCS filed a Response in Opposition to said Motion, attached hereto as Exhibit "14", arguing that Defendants are not prevailing parties on the evaluation issue and are not entitled to any relief.

224.    On January 20, 2026, the Tribunal issued an Order, attached hereto as Exhibit "15," holding that Defendants "prevailed" on their request for the evaluation and granting various relief.

## LEGAL CLAIMS

### Count I
### Judicial Review of Administrative Decision (20 U.S.C. § 1415(i)(2))

225.    This claim is brought pursuant to the IDEA, 20 U.S.C. § 1415(i)(2), which authorizes any party aggrieved by the findings and decision made in a due process hearing to bring a civil action in a court of competent jurisdiction.

226.    Plaintiff is aggrieved by specific findings, conclusions, and relief awarded in the Final Order issued by the Administrative Law Judge on November 20, 2025 following an IDEA due process hearing.

227.    The Administrative Law Judge erred as a matter of law and fact in concluding that "if the assessment ordered on October 14, 2025, indicates that H.B. has a disability and that her conduct was related to that disability, the school must immediately end the expulsion and re-enroll

H.B. in the appropriate general education class, providing the necessary services and supports as determined by the IEP Team." (Final Order at p. 19-20).

228.     The Tribunal's holding that RCS must conduct a post-hoc MDR is contrary to the IDEA's disciplinary procedures and incorrectly requires that RCS conduct a manifestation determination based on a disability that was entirely unknown at the time of the misconduct.

229.     The Tribunal's holding that RCS must immediately re-enroll H.B. if she is deemed eligible for services is erroneous and not supported by applicable law.

230.     The Administrative Law Judge erred as a matter of law and fact in concluding that "The assessment should have been expedited beginning September 11, 2025. Depending on the evaluation's outcome, the Petitioners may be the prevailing parties on issues of compensatory education, reimbursement for educational costs, and other related remedies. 20 U.S.C.A. § 1415 (k)(5)(D)(ii)." (Final Order at p. 20).

231.     The Tribunal's finding that the assessment of H.B. should have been expedited beginning September 11, 2025 is not supported by the record. The sole mention of "evaluation" in the relief section of the Due Process Complaint does not constitute a request for immediate expedited evaluation by the district under 34 C.F.R. § 300.534(d)(2)(i), and Defendants did not give sufficient notice to RCS of any request for evaluation. Any obligation by RCS to conduct a evaluation arose only after the Tribunal's October 14, 2025 Order, and RCS promptly complied with said Order.

232.     The Tribunal's holding that Defendants may be entitled to prevailing party status and relief depending on the results of H.B.'s evaluation is unsupported by the IDEA and applicable law, and is based on incorrect factual findings related to issues not properly before the Tribunal.

233.    The challenged portions of the Final Order are contrary to the IDEA, its implementing regulations, and governing case law, and are not supported by the administrative record.

234.    The Tribunal's holding that Defendants are prevailing parties on the issue of evaluation is erroneous and not supported by the administrative record. No request for an expedited evaluation under 34 C.F.R. § 300.534(d)(2)(i) was made by Defendants and RCS promptly complied with the Tribunal's October 14, 2025 Order requiring an evaluation. Any delay in H.B. obtaining an evaluation is the fault of Defendants, who waited five (5) months after H.B. was expelled to even mention an evaluation, failed to make a request for an expedited evaluation under 34 C.F.R. § 300.534(d)(2)(i) *at all*, and then waited nineteen (19) days after RCS provided evaluation paperwork to return it signed.

235.    The Tribunal's holding that Defendants are prevailing parties on the issue of evaluation is also erroneous because the administrative record shows that H.B. suffered no substantive harm and was not denied of a Free Appropriate Public Education ("FAPE") as a result of any delay in evaluation.

236.    Pursuant to 20 U.S.C. § 1415(i)(2)(C), this Court must review the administrative record, may hear additional evidence at the request of a party, and shall grant such relief as the Court determines is appropriate based on the preponderance of the evidence.

237.    Upon proper review, the Court should reverse or vacate and the Order dated January 20, 2026 and only the challenged portions of the Final Order, deny all relief awarded to Defendants in the administrative proceeding, and enter judgment declaring the RCS as prevailing party on all claims asserted in the Due Process Complaint or otherwise addressed in the Final Order or Order dated January 20, 2026.

## RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and grant the following relief:

A.     Reverse or vacate the Order dated January 20, 2026 and only those portions of the Final Order that are challenged in this action;

B.     Deny all relief awarded to Defendants in the underlying administrative due process proceeding;

C.     Declare RCS the prevailing party with respect to all claims asserted in the Due Process Complaint and all matters addressed in the Final Order;

D.     Award RCS its reasonable attorneys' fees and costs, to the extent permitted by the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(i)(3); and

E.     Grant RCS such other and further relief as the Court deems just and proper.

**Respectfully submitted,**

**HUDSON, REED & CHRISTIANSEN, PLLC**

By: **/s/ Nick C. Christiansen**
　　　　　**NICK C. CHRISTIANSEN, #30103**
　　　　　16 Public Square North
　　　　　P.O. Box 884
　　　　　Murfreesboro, TN  37133
　　　　　(615) 893-5522
　　　　　nchristiansen@mborolaw.com

　　　　　*Attorney for Rutherford County Schools*